Slip Op. 09-10

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                :
GALLANT OCEAN               :
(THAILAND) CO., LTD.,     :
                                  :
        Plaintiff,         :
                                  :        Before:       WALLACH, Judge
        v.               :        Court No.:   07-00360
                                  :
UNITED STATES,         :        **PUBLIC VERSION**
                                :
        Defendant.     :
_____:

[Plaintiff's Motion for Judgment on the Agency Record is DENIED and the Agency's Determination is AFFIRMED.]

Dated: January 30, 2009

Trade Pacific PLLC (Robert G. Gosselink, Jonathan Michael Freed, and Ji Hyun Tak) for Plaintiff Gallant Ocean (Thailand) Co., Ltd.

Michael F. Hertz, Deputy Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Stephen Carl Tosini), for Defendant United States.

**OPINION**

**Wallach, Judge:**

**I**
**INTRODUCTION**

      Plaintiff Gallant Ocean (Thailand) Co., Ltd. ("Gallant") appears before the court on its

Motion for Judgment Upon the Agency Record pursuant to USCIT Rule 56.2, challenging an

aspect of the United States Department of Commerce's ("Commerce" or "Department") findings

in Certain Frozen Warmwater Shrimp from Thailand: Final Results and Final Partial Rescission

of Antidumping Duty Administrative Review, 72 Fed. Reg. 52,065 (September 12, 2007) ("Final

Results"). This court has jurisdiction pursuant to 28 U.S.C. § 1581(c). Because Commerce's determination was supported by substantial evidence and in accordance with law, it is sustained and judgment is entered for the Defendant United States.

## II
## BACKGROUND

In April 2006, Commerce initiated the administrative review of the antidumping duty order on certain frozen warmwater shrimp from Thailand for 145 companies. Notice of Initiation of Administrative Reviews of the Antidumping Duty Orders on Certain Frozen Warmwater Shrimp from Brazil, Ecuador, India and Thailand, 71 Fed. Reg. 17,819 (April 7, 2006). The period of review was August 4, 2004 to January 31, 2006. Id. Commerce asked Gallant, and all other companies for which a review was requested, to submit a quantity and value ("Q&V") questionnaire, available on Commerce's website, on or before April 28, 2006. Id. at 17, 829. Thirty-two companies including Gallant did not timely respond. Certain Frozen Warmwater Shrimp From Thailand: Preliminary Results and Partial Rescission of Anti-Dumping Duty Administrative Review, 72 Fed. Reg. 10,669, 10,673 (March 9, 2007) ("Preliminary Results").

Commerce provided the unresponsive companies with a second opportunity in May 2006. Id. Commerce informed them in correspondence that a "failure to respond to this questionnaire may result in the Department's deeming your company uncooperative in this proceeding. In such case, the Department may assign your company an antidumping duty margin using adverse inferences in accordance with" 19 U.S.C. § 1677e(b). Letter from Shawn Thompson, Program Manager, Office 2, AD/CVD Operations, U.S. Department of Commerce, to Representatives of Non-Cooperating Companies ("To Whom it May Concern"), Re: 2004-2006 Administrative Review of the Antidumping Duty Order on Certain Frozen Warmwater Shrimp from Thailand

(May 11, 2006), Public Record ("P.R.") 144. Six companies including Gallant did not timely respond to this subsequent request. Preliminary Results, 72 Fed. Reg. at 10,673.

On March 9, 2007, Commerce found that the unresponsive companies "withheld requested information and significantly impeded the proceeding." Preliminary Results, 72 Fed. Reg. at 10,673. Commerce preliminarily determined that these companies, including Gallant, "did not act to the best of their abilities . . . because they failed to respond to the Department's requests for information. Therefore, an adverse inference is warranted in selecting from the facts otherwise available with respect to the companies." Id. Pursuant to 19 U.S.C. § 1677e(b), Commerce selected an adverse facts available ("AFA") antidumping margin for the unresponsive companies. Id. The Department "preliminarily assigned a rate of 57.64 percent, which is the highest rate alleged in the petition, as adjusted at the initiation of the less-than-fair value (LTFV) investigation." Id.

Commerce set forth its rationale for selecting the petition margin to be the AFA rate in the Preliminary Results. Because this rate relied upon secondary evidence, it had to be reasonably corroborated. 19 U.S.C. § 1677e(c). Commerce explained its corroboration as having compared the petition margin to the transaction-specific margins calculated for the three mandatory respondent companies: Good Luck Product Co., Ltd. ("Good Luck Product"), Thai I-Mei Frozen Foods Co., Ltd. ("Thai I-Mei"), and Pakfood Public Company Limited and its affiliated subsidiaries (collectively "Pakfood").[1] Preliminary Results, 72 Fed. Reg. at 10,669–70.

---

[1] The Pakfood Public Company Limited affiliated subsidiaries are Asia Pacific (Thailand) Company Limited, Chaophraya Cold Storage Company Limited, Okeanos Company Limited, and Takzin Samut Company Limited (collectively "Pakfood"). Certain Frozen Warmwater Shrimp From Thailand: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review, 72 Fed. Reg. 10,669, 10,670 (March 9, 2007) ("Preliminary Results").

Commerce preliminarily found the 57.64 percent petition rate to be "reliable and relevant because the petition rate fell within the range of individual transaction margins calculated for the mandatory respondents." Id. at 10,673. Commerce explained that both Good Luck Product and Pakfood had multiple transactions with margins higher than the petition rate, although Commerce did exclude one Thai I-Mei margin higher than 57.64 percent for being aberrational. Memorandum from Brianne Riker, Analyst, Office 2, AD/CVD Operations, U.S. Department of Commerce, to The File through Shawn Thompson, Program Manager, Office 2, AD/CVD Operations, Re: Corroboration of Adverse Facts Available for the Preliminary Results in the 2004-2006 Administrative Review of Certain Frozen Warmwater Shrimp from Thailand (February 28, 2007), P.R. 475, Confidential Record ("C.R.") 134 ("Preliminary AFA Corroboration Memo."), at 1. The Department further found that the 57.64 percent petition margin was "sufficiently adverse so as to induce cooperation" and stated an inability "to find any information that would discredit the selected AFA rate." Preliminary Results, 72 Fed. Reg. at 10,673–74.

On March 27, 2007, Gallant submitted a completed Q&V questionnaire to Commerce. Final Results, 72 Fed. Reg. at 52,066. Commerce rejected this questionnaire as untimely pursuant to 19 C.F.R. § 351.302 and returned it to Gallant on April 2, 2007. Id.; Letter from James Maeder, Director, Office 2, Office of AD/CVD Operations, U.S. Department of Commerce, to Robert Gosselink, Trade Pacific PLLC, Re: Antidumping Duty Administrative Review on Certain Frozen Warmwater Shrimp from Thailand (April 2, 2007), P.R. 495. Gallant thereafter requested that Commerce not apply the petition margin as the AFA rate. See Gallant Ocean (Thailand) Co., Ltd. Corroboration Case Brief (April 16, 2007), at 1–2, C.R. 143. Gallant contended that Commerce erred in its preliminary formulation by: employing transaction-

specific margins that were aberrational, reviewing sales from the mandatory respondent companies that did not corroborate the 57.64 percent AFA rate, and selecting sales for comparison that were atypical. Id. at 2–4. According to Gallant, the sales that Commerce used did not represent normal transactions of Good Luck Product, Thai I-Mei and Pakfood because of their product type, sale quantities, or costs. Id.

On September 12, 2007, Commerce published its final determination formally assigning the 57.64 percent AFA rate to Gallant and the other non-cooperating companies. Final Results, 72 Fed. Reg. at 52,068. Commerce reiterated its preliminary findings that: Gallant had not acted to the best of its ability, an adverse inference was warranted in selecting facts otherwise available, 57.64 percent was the highest margin alleged in the petition as adjusted, and the AFA rate was sufficiently adverse to induce cooperation. Id. In addition to its initial efforts to corroborate the 57.64 percent petition rate, Commerce undertook additional corroboration in support of the Final Results. Id. at 52,068; Memorandum from Stephen J. Claeys, Deputy Assistant Secretary for Import Administration, U.S. Department of Commerce, to David M. Spooner, Assistant Secretary for Import Administration, U.S. Department of Commerce, Re: Issues and Decision Memorandum for the Antidumping Duty Administrative Review on Certain Frozen Warmwater Shrimp from Thailand – August 2004, through January 31, 2006 (September 5, 2007), P.R. 532 ("Final Decision Memo.") cmt. 2, at 8–9, n.3.

Prior to formalizing the 57.64 percent AFA rate, Commerce concluded that the petition margin was sufficiently corroborated. Id. cmt. 2, at 8. Commerce stated that the "margin falls within the range of transaction-specific margins calculated for the mandatory respondents". Id. at 6; Memorandum from Brianne Riker, Analyst, Office 2, AD/CVD Operations, U.S. Department of Commerce, to The File through Shawn Thompson, Program Manager, Office 2, AD/CVD

Operations, Re: Final Results of the 2004-2006 Review of Certain Frozen Warmwater Shrimp

from Thailand: Corroboration Analysis (September 5, 2007), C.R. 152, P.R. 535 ("Final

Corroboration Analysis"), at 1.  The Department determined that the volumes of the transactions

it examined were neither atypical nor had an aberrational effect on the margin calculations. Id. at

2.  Commerce explained that that the AFA rate was based on both representative transactions and

official United States import statistics. Final Decision Memo. cmt. 2 at 8–9.  Dissatisfied with

the 57.64 percent AFA rate, Gallant timely initiated the present challenge to that aspect of the

Final Results.

### III
### STANDARD OF REVIEW

This court will uphold an administrative antidumping determination unless it is

"unsupported by substantial evidence on the record, or otherwise not in accordance with law."

SKF United States v. INA Walzlager Schaeffler KG, 180 F.3d 1370, 1374 (Fed. Cir. 1999)

(quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).  "Substantial evidence is more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  Aimcor, Ala. Silicon, Inc. v. United States, 154 F.3d 1375, 1378 (Fed. Cir. 1998)

(quoting Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984)).  "The

possibility of drawing two inconsistent conclusions from the evidence does not prevent an

administrative agency's finding from being supported by substantial evidence." Consolo v. Fed.

Mar. Comm'n, 383 U.S. 607, 620, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966).  In determining the

existence of substantial evidence, a reviewing court must consider "the record as a whole,

including evidence that supports as well as evidence that 'fairly detracts from the substantiality

of the evidence.'" Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1374 (Fed.

Cir. 2003) (quoting Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

While the court must consider contradictory evidence, "the substantial evidence test does not require that there be an absence of evidence detracting from the agency's conclusion, nor is there an absence of substantial evidence simply because the reviewing court would have reached a different conclusion based on the same record." Cleo Inc. v. United States, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 487–88, 71 S. Ct. 456, 95 L. Ed. 456 (1951)).

When evaluating Commerce's statutory interpretation the court uses a two step analysis, first examining whether Congress has "directly spoken to the precise question at issue." Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). If this is the case, courts then must "give effect to the unambiguously expressed intent of Congress." Id. at 842–43; see Household Credit Servs. v. Pfennig, 541 U.S. 232, 239, 124 S. Ct. 1741, 158 L. Ed. 2d 450 (2004). If instead Congress has left a "gap" for Commerce to fill, the agency's regulation is "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 843–44. Additionally, in matters of statutory construction this court will show "great deference to the interpretation given the statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16, 85 S. Ct. 792, 13 L. Ed. 2d 616 (1965). The agency's construction need not be the only reasonable one or even the same result this court would have reached had the question arisen in the first instance in a judicial proceeding. Id. (citing Unemployment Comp. Comm'n of Alaska v. Aragon, 329 U.S. 143, 153, 67 S. Ct. 245, 91 L. Ed. 136 (1946)). It is not the court's duty to "weigh the wisdom of, or to resolve any struggle between, competing views of the policy interest, but rather to respect legitimate policy choices made by the agency in interpreting and

applying the statute." Suramericana de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 665 (Fed. Cir. 1992).

## IV
## DISCUSSION

### A
### Overview Of The AFA Statute

Commerce is entitled to make adverse inferences in its antidumping duty investigation when it determines that an interested party has "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b).  The AFA rate may be generated using information from: "(1) the petition, (2) a final determination in the investigation . . . , (3) any previous review . . . , or (4) any other information placed on the record." Id.  The Department selects a proxy rate that represents a "reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." F. Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. Borden, Inc., 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("De Cecco").  Commerce is afforded extraordinary but not unlimited deference in formulating this AFA rate, as the Federal Circuit explains:

> In the case of uncooperative respondents, the discretion granted by the statute appears to be particularly great . . . . [T]his court has repeatedly held that Commerce's special expertise makes it the "master" of the anti-dumping law, entitling its decisions to great deference from the courts.  Thus, factual determinations supporting anti-dumping margins are best left to the agency's expertise. . . .  Commerce is in the best position, based on its expert knowledge of the market and the individual respondent, to select adverse facts that will create the proper deterrent to non-cooperation with its investigations and assure a reasonable margin.  Commerce's discretion in these matters, however, is not unbounded. . . .  [T]he purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins.

Id. at 1032 (citations omitted).

In formulating an AFA rate using secondary information, Commerce must, "to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c). "The statute does not prescribe any methodology for corroborating secondary information." Mittal Steel Galati S.A. v. United States, 491 F. Supp. 2d 1273, 1278 (CIT 2007). Legislative history and implementing regulations provide that such information is to have "probative value." Id. at 1275 (citing Uruguay Round Agreements Act Statement of Administrative Action, H.R. Doc. No. 103-316, at 870 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4199 ("SAA")); 19 C.F.R. § 351.308(d). "Commerce assesses the probative value of secondary information by examining the reliability and relevance of the information to be used." Mittal Steel, 491 F. Supp. at 1278. Commerce may in its corroboration examine: "published price lists, official import statistics and customs data, and information obtained from parties during the instant investigation or review." SAA at 870, 1994 U.S.C.C.A.N. at 4199; 19 C.F.R. § 351.308(d). "Commerce's determination of [AFA] rates must be legal, reasonable, and supported by evidence, but is unfettered by absolute numerical limitations." Universal Polybag Co., Ltd. v. United States, 577 F. Supp. 2d 1284, 1301 (CIT 2008).

**B**
**The Parties' Contentions**

Gallant presents a narrow question for review. As it explains:

> Gallant Ocean does not dispute that it should have responded to the Commerce Department's request for Q&V data and that it is appropriate for Gallant Ocean's rate to be based on adverse facts available. The record shows, however, that in the Final Results, the transaction-specific margins for the mandatory respondents that Commerce attempted to use to corroborate the petition were aberrational, punitively high, and did not reflect the margins of the mandatory respondents.

Memorandum of Points and Authorities in Support of Gallant Ocean's Motion for Judgment Upon the Agency Record ("Plaintiff's Motion") at 5. "By failing to adequately corroborate" the

57.64 percent AFA rate, Gallant contends that "Commerce ignored the judicial mandate that the AFA rate have a rational relationship to commercial practices in the particular industry." Id. at 7. Gallant argues that "Commerce focused its analysis on whether information showed that the AFA margin it selected had been discredited rather than sufficiently questioning whether the sales used for corroboration purposes were 'normal,' representative sales." Id. at 15 (emphasis removed). Defendant counters that the 57.64 percent AFA rate is supported by substantial evidence.[2]

## C
## The AFA Rate Is Supported By Substantial Evidence And Is In Accordance With Law

### 1
### Commerce Acted In Accordance With Law

Commerce lawfully assigned an AFA rate to Gallant. After Gallant missed two deadlines for compliance, Commerce determined that Gallant did not act to the best of its ability in failing to timely "respond to the Department's requests for information."[3] Preliminary Results, 72 Fed. Reg. at 10,673. Gallant contends that its tardy submission of the questionnaire to Commerce precludes imposition the 57.64 percent AFA rate. See Reply by Gallant Ocean (Thailand) Co., Ltd., to Defendant's Response in Opposition to Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record ("Plaintiff's Reply") at 13–14. There is no evidence supporting Gallant's

---

[2] Defendant United States does not, and need not, counter Plaintiff Gallant Ocean (Thailand) Co., Ltd.'s ("Gallant") lone reference to the "arbitrary, capricious, or . . . abuse of discretion" standard. See Memorandum of Points and Authorities in Support of Gallant Ocean's Motion for Judgment on the Agency Record ("Plaintiff's Motion") at 7. This court has recognized that the standard may merely rephrase the "substantial evidence and in accordance with law" standard. See Fujian Mach. & Equip. Imp. & Exp. Corp v. United States, 25 CIT 1150, 1156, 178 F. Supp. 2d 1305 (2001). Moreover, the Federal Circuit holds that AFA rates are to be reviewed using the substantial evidence standard. Ta Chen Stainless Steel Pipe, Inc. v. United Sates, 298 F.3d 1330, 1335 (Fed. Cir. 2002).

[3] The statute provides four bases for the application of determinations on the basis of the facts available. 19 U.S.C. § 1677e(a)(2)(A)-(D). Gallant withheld "information that has been requested by the administering authority." Id. § 1677e(a)(2)(A). Therefore, the court need not consider the "significantly impedes" basis, id. § 1677e(a)(2)(C), that was additionally relied upon by the United States Department of Commerce ("Commerce"), Preliminary Results, 72 Fed. Reg. at 10,674.

claim that its failure to comply was "not deliberate and its attempts to cooperate, although untimely, were sincere." [4] Id. at 11. Moreover, it is simply not relevant. Gallant concedes that it failed to timely submit the requested information, Plaintiff's Motion at 5, thereby triggering the application of an AFA rate pursuant to 19 U.S.C. § 1677e(a)(2)(A), (b). [5] Once Commerce properly determines that a respondent is uncooperative, it need not factor the circumstances in formulating an AFA rate. See Heveafil Sdn. Bhd. v. United States, 58 Fed. Appx. 843, 849–50 (Fed. Cir. 2003) (unpublished) ("While the antidumping statute distinguishes between respondents who have not cooperated and those who have, neither the statute nor the pertinent regulations address the weight to be given to different degrees of cooperation. . . . [T]here is no established formula requiring less adverse margins when respondents have been partially cooperative."). Similarly, Gallant's position that "it had absolutely nothing to gain from its own lack of cooperation", Plaintiff's Reply at 14,[6] is both unsupported in the record and irrelevant in the formulation of an AFA rate for a non-cooperating respondent.[7]

---

[4] The court does not view Commerce's returning of Gallant's untimely questionnaire as support for this proposition. See Letter from James Maeder, Director, Office 2, AD/CVD Operations, U.S. Department of Commerce, to Robert Gosselink, Trade Pacific PLLC, Re: Antidumping Duty Administrative Review of Certain Frozen Warmwater Shrimp from Thailand (April 2, 2007), Public Record ("P.R.") 495.

[5] Gallant cannot claim that its untimely attempt to cooperate prevents the imposition of any adverse facts available ("AFA") rate because "the statute does not contain an intent element . . . . The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1383 (Fed. Cir. 2003).

[6] Gallant misplaces reliance on Mittal Steel Galati S.A. v. United States, 491 F. Supp. 2d 1273 (CIT 2007). There, the court sustained an AFA rate greater than the margin that Commerce preliminarily selected after "Plaintiff's conduct led Commerce to infer that Plaintiff's actual dumping rate was higher." Id. at 1278. However, Mittal Steel does not hold that the extent to which a respondent benefits from its failure to cooperate is relevant in the AFA formulation, as Gallant implies. See Reply by Gallant Ocean (Thailand) Co., Ltd., to Defendant's Response in Opposition to Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record ("Plaintiff's Reply") at 13–14.

[7] The court does not construe legislative history that an objective of the AFA rate is to "ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully" as making the potential gain to an uncooperative respondent relevant in the AFA rate formulation. Uruguay Round Agreements Act Statement of Administrative Action, H.R. Doc. No. 103-316, at 870 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4199.

**2**
**The 57.64 Percent AFA Rate Is Supported by Substantial Evidence**

Commerce formulated the AFA rate by selecting the highest margin alleged in the petition, as adjusted. Preliminary Results, 72 Fed. Reg. at 10,673  The AFA statute explicitly authorizes Commerce to use the "petition" when a respondent is uncooperative. 19 U.S.C. § 1677e(b)(1).  Gallant alleges that Commerce improperly selected the 57.64 percent petition margin based upon an absence of information to discredit the rate. Plaintiff's Motion at 15.  The Department acknowledges initially taking this approach. Preliminary Results, 72 Fed. Reg. at 10,674; Final Decision Memo. cmt. 2, at 8.  Commerce may begin its AFA rate selection by ascertaining whether the petition margin is discredited, provided that the rate is ultimately supported by substantial evidence.  This starting point is appropriate where Commerce has incomplete information due to non-compliance.  See Shanghai Taoen Int'l Trading Co., Ltd. v. United States, 29 CIT 189, 199, 360 F. Supp. 2d 1339 (2005).  "To corroborate the petition margin," the Department compared it to the rates calculated for Good Luck Product, Thai I-Mei and Pakfood, and found that the petition "rate fell within the range of individual transactions margins calculated for the mandatory respondents." Preliminary Results, 72 Fed. Reg. at 10,673.

After reviewing actual sales of Good Luck Product and Pakfood, Commerce found multiple transaction-specific margins "within the range of the AFA rate, but slightly lower" and several others "higher than 57.64 percent." Memorandum from Brianne Riker, Analyst, Office 2, AD/CVD Operations, U.S. Department of Commerce, to The File through Shawn Thompson, Program Manager, Office 2, AD/CVD Operations, Re: Corroboration of Adverse Facts Available Rate for the Final Results in the 2004-2006 Administrative Review of Certain Frozen Warmwater Shrimp from Thailand (September 5, 2007), C.R. 153 ("Final Corrobroation

Memo."), at 1.  With respect to Thai I-Mei, Commerce excluded a single outlier,[8] and found the

remaining margins within the range of the AFA rate. Preliminary AFA Corroboration Memo. at

1.  In all, Commerce relied upon nineteen transactions of Good Luck Product, Thai I-Mei and

Pakfood within the range of the petition margin to support the 57.64 percent AFA rate. See Final

Corroboration Analysis at 1, Attachments 2–4.  This data includes sales identified by Commerce

subsequent to the Preliminary Results in response to Gallant's concerns. Final Corrobration

Memo at 1.[9]  [[ The margins for the nineteen transactions ranged from approximately 50 percent

to 130 percent. Final Corroboration Analysis, Attachments 2–4. ]]

    This court has sustained Commerce's comparison to transaction-specific margins of other

respondents as an appropriate means to corroborate AFA rates. See, e.g., NSK Ltd. v. United

States, 28 CIT 1535, 1561–62, 346 F. Supp. 2d 1312 (2004), aff'd, 481 F.3d 1355 (Fed. Cir.

2007); Shanghai Taoen, 29 CIT at 199.  The 57.64 percent AFA rate was "corroborated by actual

sales data." Ta Chen Stainless Steel Pipe, Inc. v. United Sates, 298 F.3d 1330, 1339 (Fed. Cir.

2002) ("Ta Chen").  Commerce compared this petition rate with multiple actual sales, whereas

---

[8] Gallant argues that the lack of analysis supporting the exclusion of this one transaction establishes the 57.64 percent AFA rate being unsupported by substantial evidence. Plaintiff's Motion at 11 n.3; Plaintiff's Reply at 4.  This Thai I-Mei Frozen Foods Co., Ltd. ("Thai I-Mei") margin was [[ extremely high, many ]] times the petition margin. Memorandum from Brianne Riker, Analyst, Office 2, AD/CVD Operations, U.S. Department of Commerce, to The File through Shawn Thompson, Program Manager, Office 2, AD/CVD Operations, Re: Corroboration of Adverse Facts Available for the Preliminary Results in the 2004-2006 Administrative Review of Certain Frozen Warmwater Shrimp from Thailand (February 28, 2007), P.R. 475, Confidential Record ("C.R.") 134.  The court finds that its exclusion by Commerce is self-explanatory and does not render the petition rate unsubstantiated.

[9] The seven additional transaction-specific margins percents are [[ a little higher and a little lower than the 57.64 AFA rate. ]] Memorandum from Brianne Riker, Analyst, Office 2, AD/CVD Operations, U.S. Department of Commerce, to The File through Shawn Thompson, Program Manager, Office 2, AD/CVD Operations, Re: Corroboration of Adverse Facts Available for the Preliminary Results in the 2004-2006 Administrative Review of Certain Frozen Warmwater Shrimp from Thailand (September 5, 2007), C.R. 153, at 1.

the Federal Circuit in Ta Chen sustained an AFA rate for an uncooperative respondent that was

based upon a single transaction. Id. Gallant argues that because Ta Chen involves sales

information of the plaintiff, as opposed to other companies, the holding is not relevant for 19

U.S.C. § 1677e(c) corroboration purposes. Plaintiff's Reply at 10–13 (citing Ta Chen Stainless

Steel Pipe, Inc. v. United States, 24 CIT 841, 846 (2000)). The court does not agree that Ta

Chen is distinguishable on this basis and instead finds the precedent applicable to AFA rate

corroboration using actual sales data, irrespective of whether those transactions involve the

plaintiff or secondary information under 19 U.S.C. § 1677e(c). See Ta Chen, 298 F.3d at 1339–

40.

Commerce sufficiently corroborated the 57.64 percent AFA rate. The statute qualifies

the obligation as "to the extent practical", 19 U.S.C. § 1677e(c); "the corroboration requirement

itself is not mandatory when not feasible." NSK, 28 CIT at 1561–62. After comparing the rate to

industry statistics, Commerce concluded that the petition margin "was not based on a unique or

unusual set of circumstances that would render it unrepresentative of the experience of a typical

shrimp importer from Thailand." Final Decision Memo. cmt. 2 at 8. Commerce thereby

"assure[d] itself that the margin it applie[d] is relevant, and not outdated, or lacking a rational

relationship to" Gallant. Ferro Union, Inc. v. United States, 23 CIT 178, 205, 44 F. Supp. 2d

1310 (1999). In formulating the 57.64 percent AFA rate, Commerce neither "overreach[ed]

reality," Ta Chen, 298 F.3d at 1340 (citation omitted), nor made a mere assumption, Ferro

Union, 23 CIT at 205.

The nineteen transactions within range of the petition margin and compared to industry

statistics demonstrate that Commerce did not improperly "'cherry pick' select sales arbitrarily"

as a means of corroboration. NSK, 28 CIT at 1556 (citation omitted). The 57.64 percent AFA

rate has both a "relationship to commercial practices in the particular industry," D & L Supply

Co. v. United States, 113 F.3d 1220, 1223–24 (Fed. Cir. 1997), and a "basis in reality," De

Cecco, 216 F.3d at 1034. The AFA rate was therefore not selected solely and impermissibly for

punitive purposes as Gallant alleges. See Plaintiff's Motion at 7. "While Commerce may have

chosen the . . . rate with an eye toward deterrence, Commerce acts within its discretion so long

as the rate chosen has a relationship to the actual sales information available." Ta Chen, 298 F.3d

at 1340.

　　　　Gallant contends that Commerce erred in failing to corroborate the AFA rate "with

representative margins of the mandatory respondents." Plaintiff's Motion at 13. Gallant

emphasizes that the nineteen transaction-specific margins used comprise only [[ a very small

percentage ]] of all sales reported by Good Luck Product, Thai I-Mei[10] and Pakfood for the

review period. Id. at 12. Gallant argues that because this fraction does not "represent a

significant portion of the transactions that occurred during the period of review," the sales within

range of the petition rate should be disregarded as "high-margin transactions [that] are the

exception rather than the rule." Id. at 10–11 (quoting PAM, S.p.A. v. United States, 495 F. Supp.

2d 1360, 1371–72 (CIT 2007) (citations omitted) (emphasis removed)). However, this court

recently sustained an AFA margin based upon actual sales of cooperating respondents being "in

a range above and near the AFA rate chosen," notwithstanding an argument that the "low

number" of these transactions constituted "evidence of its unreliability." Universal Polybag, 577

F. Supp. 2d at 1298–99, 1301. Defendant is correct that "Ta Chen now controls this issue."

Defendant's Opposition to Plaintiff's Motion for Judgment Upon the Agency Record

("Defendant's Opposition") at 13. Ta Chen establishes that Commerce need not consider the

---

[10] Gallant calculates the two Thai I-Mei sales used for corroboration as representing "a scant [[ very small ]] percent of all Thai I-Mei sales." Plaintiff's Motion at 11.

portion of sales represented by transaction-specific margins used for corroboration.  See Ta

Chen, 298 F.3d at 1339–40; Pam, S.p.A. v. United States, Slip Op. 08-75, 2008 Ct. Int'l Trade

LEXIS 73, at *11 (July 9, 2008) ("Pam II").

Gallant claims that Commerce should not have used certain Pakfood and Good Luck

Product sales because their atypical volumes rendered them aberrational.[11]  See Plaintiff's Motion

at 18–20.  Prior to the Final Results, Commerce in response undertook detailed analyses of each

corroborating margin and "found they were based on representative transactions." Final

Corroboration Analysis at 2, Attachments 1–4.  The Department concluded that:

> Good Luck Product and Pakfood reported multiple U.S. sales transactions with
> volumes in the same range or smaller than the transactions used in the
> corroboration analysis . . . .  Therefore, we do not find that the quantities in
> question are unusually smaller or atypical.  In addition, we note that the margins
> varied greatly for transactions of similar volumes to those used for corroboration
> purposes.  Thus, we disagree with Gallant Ocean that the margins calculated for
> the sales transactions in question were driven by the volume of those sales.

Final Decision Memo. cmt. 2, at 9 (citation omitted).

This volume analysis supports the 57.64 percent petition margin being selected as the AFA rate.

As with the number of corroborating transactions, there is no numerical requirement with respect

to the volumes of those sales.  Universal Polybag, 577 F. Supp. 2d at 1299–1301 (rejecting an

argument that "the low . . .  volume of individual transaction margins" used for corroboration

invalidated the AFA rate).

Gallant challenges Commerce's use of the Pakfood transactions because half "were not

normal sales of subject merchandise, but instead were [[ Product A ]]." Plaintiff's Motion at 16.

Gallant claims that they [[ are priced differently ]] and therefore should not be used for AFA rate

---

[11] Gallant challenges one Good Luck Product sale as being a shipment of only [[ a small weight ]] and all twelve Pakfood sales for comprising only [[ a very small percentage ]] of all shrimp that Pakfood sold to the United States during the period of review. Plaintiff's Motion at 18, 19–20.

corroboration purposes. Id. Commerce initially excluded [[ Product A ]] based on the absence of a reasonable methodology to include such sales, but expressed an expectation to reexamine the issue. Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp From Thailand, 69 Fed. Reg. 76,918 (December 23, 2004), attached Issues and Decision Memorandum for the Antidumping Duty Investigation of Certain Frozen and Canned Warmwater Shrimp from Thailand cmt. 4. Commerce subsequently stated that it would use Pakfood's sales of [[ Product A ]] for comparison purposes, (Preliminary Results, 72 Fed. Reg. at 10,674), despite the merchandise not being identical.

Inclusion of Pakfood's sales of [[ Product A ]] does not detract from the substantial evidence supporting the 57.64 percent AFA rate. Commerce addressed this concern by referencing the absence of evidence to indicate such sales being under-representative and emphasizing that it "did not rely solely on margins calculated for Pakfood," but those of the other mandatory respondents that Gallant did not allege were of "unusual merchandise". Final Decision Memo. cmt. 2 at 9. Gallant concedes that [[ Product A is included within the scope of the order ]]. Plaintiff's Motion at 16. More compelling, however, is Commerce's specific matching in advance of the Final Results, of the merchandise types. Preliminary Results, 72 Fed. Reg. at 10,674.[12]

Commerce does not need to replicate the precise business activities of a non-cooperating respondent in formulating the AFA rate. See Nat'l Candle Ass'n v. United States, 29 CIT 365, 372, 366 F. Supp. 2d 1318 (2005) (Commerce not required "to apply product-specific margins");

---

[12] Gallant asks the court to disregard this explanation by Commerce as improperly *post hoc*. Plaintiff's Reply at 7. However, a statement in the Preliminary Results remains part of the record irrespective of whether it is reiterated by Commerce in subsequent documentation formalizing the AFA rate.

<u>Reiner Brach GMBH & Co. KG v. United States</u>, 26 CIT 549, 565–66, 206 F. Supp. 2d 1323, 1338–39 (2002) (AFA rate need not consider a non-cooperating respondent's unique "product line" and "sales revenue"). Therefore, Commerce did not err in corroborating the AFA rate with either the Pakfood margins involving [[ Product A ]] or the one other Pakfood transaction and two Good Luck Product sales that consisted of [[ Product B ]]. As with [[ Product A ]], the antidumping order scope encompasses [[ Product B ]]. <u>Preliminary Results</u>, 72 Fed. Reg. at 10,671–72.

Gallant acknowledges that Commerce responded to some of the concerns raised during the administrative process. Plaintiff's Motion at 6. Gallant contends that the Department improperly ignored a specific challenge to four Pakfood transactions of shrimp sold in one-pound bags. <u>Id.</u> at 17; Plaintiff's Reply at 9. Gallant believes that these four sales had unusually high normal values, as it claims to be demonstrated by them having the highest total costs of any of Pakfood's products sold during the period of review. <u>Id.</u> Nevertheless, Commerce analyzed every Pakfood transaction and found each to be sufficiently representative in advance of the <u>Final Results</u>. Final Corroboration Analysis at 2, and Attachments 1, 3. Even if the one-pound bag sales are not used for corroboration, the fifteen remaining margins comprise substantial evidence supporting the 57.64 percent AFA rate in accordance with <u>Ta Chen</u>. For these reasons, despite Commerce's failure to directly address Gallant's one-pound bag argument, the selection of the petition margin as the AFA rate is supported by substantial evidence.

Gallant attempts to discredit the 57.64 percent AFA rate with reliance on the 4.31 percent rate that Commerce calculated for the cooperating selected respondents. Plaintiff's Motion at 21–22 (citing <u>Final Results</u>, 72 Fed. Reg. at 52,069). However, the margin ultimately applied to the cooperating respondents does not cast doubt upon an AFA rate that is supported by substantial

evidence. See Universal Polybag, 577 F. Supp. 2d at 1298–1301 (rejecting argument based on a "large gap between the petition rate and the dumping margin calculated by Commerce for any cooperative respondents" (citation omitted)). Moreover, the Federal Circuit upheld an AFA rate where the corroborative data reflects actual sales as opposed to the rate ultimately imposed for cooperating respondents. See Ta Chen, 298 F.3d at 1340.

Gallant also attempts to support its position with reference to the overall dumping margins for the mandatory respondents ranging between 2.58 and 10.75 percent. Plaintiff's Motion at 10–11 (citing Final Results, 72 Fed. Reg. at 52,069). Gallant claims that, "[t]herefore, it is apparent that any transaction margins higher than (or slightly lower) than 57.64 percent are aberrant." Id. at 10–11. However, as Defendant observes, necessarily "there will be sales above and below the average." Defendant's Opposition at 12. Furthermore, Gallant's position would give companies having transactions above the range of the mandatory respondents a disincentive to cooperate with Commerce so that they can obtain the benefit of a lower margin.

Gallant proposes alternate approaches that it believes Commerce should have employed in formulating the AFA rate. Gallant suggests that Commerce articulate both the criteria for determining why margins are excluded and its application to each transaction-specific margin in the corroboration analysis.[13] Plaintiff's Motion at 20. Gallant details methodologies it believes to be appropriate. See id. at 20–22 (the highest margin within a band that represents at least ten percent of the margins);[14] Plaintiff's Reply at 5–6 (the highest margin within one standard deviation of the mean). However, because of Gallant's "noncooperation," it "cannot pick and

---

[13] Gallant finds support for this approach in Nat'l Steel Corp. v. United States, 18 CIT 1126, 870 F. Supp. 1130 (1994). Plaintiff's Motion at 20. The court there remanded for Commerce to articulate criteria as Gallant proposes. Nat'l Steel Corp., 18 CIT at 1133. However, as Defendant points out, Nat'l Steel Corp. predates Ta Chen. Defendant's Opposition to Plaintiff's Motion for Judgment Upon the Agency Record ("Defendant's Opposition") at 13. Commerce is now able to corroborate AFA margins using actual transaction data rather than having to articulate criteria for determining when rates are aberrant. See Ta Chen, 298 F.3d at 1339–40.

choose which rate it feels would be more appropriate in the circumstance." <u>NSK</u>, 28 CIT at

1562.

      Gallant hindered Commerce's antidumping investigation by failing to timely submit the

Q&V questionnaire and was warned about the consequences of non-compliance. "Ultimately,

respondents have the responsibility of creating an adequate record." <u>Id.</u> at 1558. AFA "cases

operate in a world of less-than-perfect information." <u>PAM, S.p.A. v. United States</u>, 577 F. Supp.

2d 1318, 1321 (CIT 2008) (denying reconsideration of <u>Pam II</u> by rejecting the argument that <u>Ta

Chen</u> is undermined by <u>Exxon Shipping Co. v. Baker</u>, 128 S. Ct. 2605, 171 L. Ed. 2d 570, 76

U.S.L.W. 4603 (2008)[15]). Commerce need not speculate as to the actual rate had the respondent

cooperated. <u>See</u> SAA at 870, 1994 U.S.C.C.A.N. at 4199.  Commerce is only required to

formulate an AFA rate that is supported by substantial evidence and in accordance with law. <u>Ta

Chen</u>, 298 F.3d at 1335.  This standard is met by the 57.64 percent AFA rate that Commerce

applied to Gallant.

**V**
**CONCLUSION**

      For the above stated reasons, Commerce's determination in <u>Certain Frozen Warmwater</u>

<u>Shrimp from Thailand: Final Results and Final Partial Rescission of Antidumping Duty</u>

---

[14] Gallant references three 1999 antidumping proceedings in which Commerce employed this methodology. Plaintiff's Motion at 21.  Defendant in response informs the court that "[t]his is not current practice.  Commerce has since established a practice of using actual transaction specific margins of other respondents for corroboration." Defendant's Opposition at 16.  The court need not review a methodology previously employed by Commerce to formulate an AFA rate because Commerce has "broad discretion to change its methodology," <u>Nat'l Steel Corp.</u>, 18 CIT at 1130, provided that "a methodology consistent with its statutory authority" is ultimately employed, <u>Allied-Signal Aerospace Co. v. United States</u>, 28 F.3d 1188, 1191 (Fed. Cir. 1994).

[15] The U.S. Supreme Court held that the maximum award of punitive damages allowed under maritime law was equal the jury's award of compensatory damages. <u>Exxon Shipping Co. v. Baker</u>, 128 S. Ct. 2605, 171 L. Ed. 2d 570, 76 U.S.L.W. 4603 (2008).

Administrative Review, 72 Fed. Reg. 52,065 (September 12, 2007) is AFFIRMED.


                              \_\_/s/ Evan J. Wallach\_\_\_\_
                              Evan J. Wallach, Judge


Dated:       January 30, 2009
               New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

```
GALLANT OCEAN                    :
(THAILAND) CO., LTD.,            :
                                 :
            Plaintiff,           :
                                 :      Before:      WALLACH, Judge
      v.                         :      Court No.:   07-00360
                                 :
UNITED STATES,                   :
                                 :
            Defendant.           :
_____ :
```

## ORDER AND JUDGMENT

This case having come before the court upon the Motion for Judgment Upon the Agency Record filed by Plaintiff Gallant Ocean (Thailand) Co., Ltd. ("Plaintiff's Motion"); the court having reviewed all pleadings and papers on file herein, having heard oral argument by each party, and after due deliberation, having reached a decision herein; now, in conformity with said decision, it is hereby

ORDERED, ADJUDGED AND DECREED that Plaintiff's Motion is DENIED; and it is further

ORDERED, ADJUDGED AND DECREED that the decision of the United States Department of Commerce in Certain Frozen Warmwater Shrimp from Thailand: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review, 72 Fed. Reg. 52,065 (September 12, 2007), is hereby AFFIRMED; and it is further

ORDERED that all parties shall review the court's Opinion in this matter and notify the court in writing on or before Monday, February 9, 2009, whether any information contained in the Opinion is confidential, identify any such information, and request its deletion from the public version of the Opinion to be issued thereafter. The parties shall suggest alternative language for any portions they wish deleted. If a party determines that no information needs to be deleted, that party shall so notify the court in writing on or before February 9, 2009.

Dated: January 30, 2009
     New York, New York

          /S/       Evan J. Wallach
                   Judge

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                            Deputy Clerk